IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re:                          )      Chapter 11
                                )      Case No. 06-10110(CSS)
RNI WIND DOWN                   )
CORPORATION, et al.             )      (Jointly Administered)
                                )
                                )      Related Doc. Nos. 936,
            Debtors.            )      1305 and 1343

**OPINION**[1]

Michael Nestor                  Steven K. Kortanek
Kenneth J. Enos                 Womble Carlyle Sandridge
Young Conaway Stargatt          & Rice, PLLC
& Taylor, LLP                   222 Delaware Avenue
P.O. Box 391                    Suite 1501
Wilmington, DE 19899            Wilmington, DE  19801

Attorneys for MacKay Shields LLC   William R. Baldiga
and Highbridge International LLC    Sunni P. Beville
                                    Brown Rodnick Berlack
Victoria Watson Counihan            Israels LLP
Dennis Meloro                       One Financial Center
Greenberg Traurig, LLP              Boston, MA  02111
The Nemours Building
1007 North Orange Street            Attorneys for the Plan
Suite 1200                          Administrator
Wilmington, DE 19801

Edward H. Tillinghast, III
Malani Sternstein
Sheppard Mullin Richter
& Hampton LLP
30 Rockefeller Plaza, 24th Floor
New York, New York 10112

Attorneys for U.S. Bank National
Association, as Indenture Trustee

Dated: March 29, 2007

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

Sontchi, J. *Christopher S Sontchi*

## Introduction

Before the Court are two related but distinct motions concerning the payment of the legal fees incurred by U.S. Bank National Association as indenture trustee under certain pre-petition notes of the debtors.[2] The procedural history is somewhat involved but the issues boil down to: (i) should the Court approve a settlement of a claim objection where approximately 50% of the indenture trustee's legal fees will be borne by the debtors' estates; and (ii) should the Court interpret the terms of the confirmed plan of reorganization to limit the indenture trustee's legal fees to those recoverable from the debtors' estates when the express terms of the indenture provide otherwise.

With regard to the proposed settlement, applying the *Drexel-TMT Trailer-Martin* factors, the Court cannot find that the settlement is fair and equitable. Due to the numerous redactions in the legal invoices underlying the indenture trustee's claim, it is impossible to determine the likelihood of success on the merits of the indenture

---

[2] The motions before the Court are: (i) The Equity Committee's and Plan Administrator's Second Omnibus Objection (Substantive) to Claims [Docket No. 936]; and (ii) Motion Seeking Order Compelling Compliance with Confirmation Order and Granting Sanctions [Docket No. 1305].

trustee's claim.  Thus, even in applying the *Drexel-TMT Trailer-Martin* factors as a whole, the Court cannot approve the settlement.

With regard to the motion to compel the indenture trustee to limit its legal fees to those recoverable from the debtors' estates, the Court finds that the confirmed plan of reorganization did not modify the terms of the indenture, including the purported right of the trustee under the indenture to assert a charging lien against the proceeds of the notes.  Whether such a charging lien may be properly asserted under the terms of the indenture or may be subject to defenses is a matter over which this Court has no jurisdiction.  Thus, the motion is denied.

## Jurisdiction and Venue

Subject to the limitations discussed below, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (L) and (O).

## General Background

On February 7, 2006 (the "Petition Date"), Riverstone Networks, Inc. and certain of its affiliates (the "Debtors") filed voluntary petitions for relief under

Chapter 11 of the Bankruptcy Code. The Office of the United States Trustee appointed official committees of both creditors and equity security holders in this case.

At the time of filing, the Debtors did not have any material secured debt and no existing secured lending facility. The Debtors funded their operations from the sale of products and from cash on hand. The cash was raised from, among other things, the issuance of the 3 ¾% Convertible Subordinated Notes due December 1, 2006 (the "Notes"), pursuant to the terms of the Indenture dated as of November 21, 2001 (the "Indenture"). At all material times, U.S. Bank National Association ("U.S. Bank") has been the trustee under the Indenture. The principal outstanding on the Notes, as of the Petition Date, was approximately $66 million.

In March, 2006, the Court approved the sale of substantially all the Debtors' assets to Lucent Technologies, Inc. (the "Lucent Sale") with the support of both official committees. In April, 2006, the Lucent Sale closed. The Debtors received approximately $197 million under the Lucent Sale.

In June, 2006, the Debtors filed the Joint Plan of Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by the Debtors, the Official

4

Committee of Unsecured Creditors and the Official Committee of Equity Security Holders (the "Plan"). The Plan (as subsequently modified by the proponents) was confirmed by the Court on September 12, 2006.[3] Pursuant to the terms of the Plan, Craig R. Jalbert was appointed as the Plan Administrator.

Section 4.5 of the Plan governs the payment of claims under the Notes. Specifically, section 4.5 of the Plan provides, in pertinent part, as follows:

### 4.5 Class 5 – Bondholder Claims

(a) Allowance of Claims. Subject to the provisions of Section 4.5(e) with respect to the payment of the reasonable documented fees and expenses of the Bond Trustee, the Bondholder Claims shall constitute Allowed Claims for purposes of this Plan and distributions to be made hereunder.

(b) Impairment and Voting. Class 5 is impaired by this Plan. Each Holder of an Allowed Bondholder Claim in Class 5 is entitled to vote to accept or reject this Plan.

(c) Distributions to Class 5. Each Holder of an Allowed Bondholder Claim in Class 5 shall be entitled to receive Cash in an amount equal to its Pro Rata Share of the Allowed Bondholder Claim. Notwithstanding anything in the Plan, the Confirmation Order, or any other document to the contrary, for the purpose of distributions to the holders of Bondholder Claims, the Bond Trustee

---

[3] See Findings Of Fact, Conclusions Of Law, And Order Under 11 U.S.C. §§ 1129(a) And (b) And Fed. R. Bankr. P. 3020 Confirming Joint Plan Of Reorganization And Liquidation Under Chapter 11 Of The Bankruptcy Code Proposed By The Debtors, The Official Committee Of Unsecured Creditors And The Official Committee Of Equity Security Holders, As Revised (the "Confirmation Order").

shall be deemed to be the sole holder of all Bondholder Claims. Accordingly, all distributions on account of Bondholder Claims shall be distributed to the Bond Trustee on or as soon as practicable after the Effective Date, but in any event no later than the Initial Distribution Date for further distribution to or for the benefit of the holders of Bonds as of the Distribution Record Date pursuant to Section 4.5 of the Plan. The Distribution Record Date shall be used as the record date for the distributions pursuant to the Bond Indenture.

(d) <u>Method of Distributions</u>. Any and all Cash to be distributed to Holders of Allowed Bondholder Claims shall be distributed by the Plan Administrator to the Bond Trustee on behalf of the Holders of Allowed Bondholder Claims, and promptly thereafter from the Bond Trustee to Holders of Allowed Bondholder Claims in accordance with the terms of the Bond Indenture.

(e) <u>Fees and Expenses of Bond Trustee</u>. Within ten (10) days of the Confirmation Date, the Bond Trustee shall provide the Debtors with a detailed statement of its fees and expenses incurred and/or estimated to be incurred in connection with the Chapter 11 Cases from and including the Commencement Date through the Confirmation Hearing.  To the extent of legal fees and expenses incurred, such fees shall be described in sufficient detail to evaluate the reasonableness of such legal fees and expenses according to applicable standards and shall contain detailed time records, subject to protection for any privileged information.  On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Debtors shall pay the documented fees and expenses of the Bond Trustee, to the extent it agrees such fees and expenses are reasonable, as required by the terms of the Bond Indenture and this Plan.  The Debtors shall simultaneously notify the Bond Trustee of any disputes it may have to any portion of the amount and/or payment by the Debtors of such fees and expenses, which dispute may thereafter, and if the parties so

agree, be resolved by the Bankruptcy Court applying the applicable state law standard of reasonableness unless the Bankruptcy Court determines, after notice and a hearing, that state law does not apply, provided that the Debtors shall reserve any amounts in dispute pursuant to this section, pending resolution. In connection with any such dispute, the Debtors shall not object to any request made by a Holder of an Allowed Bondholder Claims to intervene in or be heard with respect to such dispute.

In addition, the fees and expenses of the Bond Trustee from and after the Confirmation Hearing and through the date of cancellation of the Bonds in accordance with subsection (f) of this Section, shall be paid in the same manner as provided for in the foregoing paragraph of this subsection 4.5(e). . .

(f) <u>Cancellation of the Bonds</u>. Upon final payment to the Bond Trustee for distribution to or for the benefit of the holders of Bonds as of the Distribution Record Date, the Bonds shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule.

**The U.S. Bank Claim**

On May 31, 2006, U.S. Bank filed a proof of claim on behalf of all the Note holders in the amount of approximately $66.9 million plus an unliquidated amount, including the fees and expenses of U.S. Bank.[4]  This proof of claim is referred to as Claim No. 185.

---

[4] Section 7.2 of the Indenture provides that, in the event of a bankruptcy, the indenture trustee may "file such proofs of claim and other papers and or documents as may be necessary or advisable in order to have the claims of the [indenture trustee] and of the Noteholders allowed in such judicial proceedings" and "to collect and receive any monies or other property payable or deliverable on any such claims, and

In September, 2006, U.S. Bank filed a second proof of claim for the fees and expenses of U.S. Bank incurred in connection with the bankruptcy. This proof of claim, Claim No. 377, was for $238,023.49.

On September 15, 2006, U.S. Bank requested that the Plan Administrator pay U.S Bank a total of $495,272.96 for its fees and expenses incurred in connection with the bankruptcy from the Petition Date through the date of confirmation of the Plan. U.S. Bank provided the Plan Administrator with the supporting statements of its fees and expenses, which were heavily redacted for privilege. This request for payment was made under section 4.5(e) of the Plan and constituted, in effect, a modification of Claim Nos. 185 and 377. Subsequently, U.S. Bank reduced this request to $482,437.82.

On September 22, 2006, the Plan Administrator filed The Equity Committee's and Plan Administrator's Second Omnibus Objection (Substantive) to Claims [Docket No. 936] (the "Claim Objection").[5] Through that portion of the Claim Objection applicable here, the Plan Administrator seeks to

---

to distribute the same after deduction of any amounts due to the [indenture trustee] under section 8.6 [of the Indenture]." Section 8.6 of the Indenture further provides that the Debtors shall pay the indenture trustee for its fees and expenses, including the fees and expenses of counsel.

[5] The Equity Committee was subsequently dissolved. Thus, all further references are made solely to the Plan Administrator.

expunge those portions of Claim Nos. 185 and 377 (as modified) representing U.S. Bank's fees and expenses.

Immediately thereafter, the Plan Administrator made a distribution to U.S. Bank under section 4.5(d) of the Plan in the amount of $68,478,755.56 on account of the Allowed Bondholder Claim (as defined in the Plan). As a result of the pending Claim Objection, this amount was solely for principal and interest through the date of distribution and did not include any amount for U.S. Bank's fees and expenses.

On December 22, 2006, U.S. Bank requested payment of an additional $124,518.80 for fees and expenses incurred by U.S. Bank in connection with the bankruptcy since confirmation of the Plan Once again, the supporting invoices were heavily redacted for privilege. Thus, U.S. Bank seeks total payment by the Plan Administrator of no less than approximately $607,000 for fees and expenses incurred in connection with the bankruptcy.[6]

U.S. Bank has distributed to the Note holders all but approximately $600,000 of the $68,478,755.56 received from the Plan Administrator on account of the Allowed Bondholder Claim. Under U.S. Bank's right under the Indenture to

---

[6] This amount may rise as U.S. Bank continues to incur fees and expenses in connection with the bankruptcy.

assert a "charging lien", U.S. Bank has held back these funds to cover its fees and expenses in the event that the Plan Administrator does not pay some or all of U.S. Bank's fees and expenses incurred in connection with the bankruptcy.[7]

**The Settlement**

In February, 2007, the Plan Administrator and U.S. Bank settled the Claim Objection under the terms and conditions contained in the Stipulation and Agreed Order Resolving Objection of the Equity Committee and Plan Administrator to the Claims of U.S. Bank National Association, as Indenture Trustee [Docket No. 1343] (the "Stipulation"). Under the Stipulation, the Plan Administrator will pay U.S. Bank $300,000 in full and final compromise of the amounts due "on the Claims." The "Claims" are defied in the Stipulation as "the Filed Claims, the Allowed Bondholder Claim and/or the Section

---

[7] Section 8.6 of the Indenture provides that the Debtors' obligation to pay the fees and expenses of the indenture trustee "shall be secured by a lien prior to that of the Notes upon all property and funds held or collected by the [indenture trustee]." Similarly, section 7.2 of the Indenture provides that "[t]o the extent that . . . payment of reasonable compensation, expenses, advances and disbursements out of the estate . . . shall be denied for any reason" the indenture trustee's fees and expenses "shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, monies, securities and other property which the holders of the Notes may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization." Finally, section 7.3 of the Indenture provides the priority for application of any monies collected by the indenture trustee shall go "FIRST: To the payment of all amounts due the [indenture trustee] under section 8.6 [of the Indenture]."

4.5(e) Amounts." The "Filed Claims" are Claim Nos. 185 and 377; the "Allowed Bondholder Claim" has the meaning set forth in the Plan; and the "Section 4.5(e) Amounts" constitute the "detailed statements of the pre-Confirmation and post-Confirmation legal expenses of [U.S. Bank]."

Thus, under the terms of the Stipulation, U.S. Bank will receive an additional $300,000 in full and final payment of all claims relating to the Notes, including U.S. Bank's claim for fees and expenses. This will leave U.S. Bank with a shortfall of approximately $300,000 in its fees and expenses, which U.S. Bank asserts is payable under the terms of the Indenture from the $600,000 holdback from the payment U.S. Bank previously received on account of the Allowed Bondholder Claim.

On March 9, 2007, the Court held a hearing in connection with the settlement of the Claim Objection through the Stipulation. The Plan Administrator testified in support of the Stipulation. Highbridge International LLC and MacKay Shields LLC, both of which are Note holders, (the "Objecting Note Holders") objected to the Stipulation and cross-examined the Plan Administrator.[8] The legal

---

[8] On March 9, 2007, the Court entered an Order granting the Objecting Note Holders' motion to intervene in the Claim Objection.

invoices underlying the U.S. Bank claim for fees and expenses were admitted into evidence in redacted form.

In addition, on March 9, 2007, the Court held a hearing on the Motion Seeking Order Compelling Compliance with Confirmation Order and Granting Sanctions [Docket No. 1305] (the "Motion to Compel") filed by the Objecting Note Holders.  No testimony was adduced in connection with the Motion to Compel, which U.S. Bank opposed.[9]

**Legal Discussion**

***Should the Court Approve the Settlement?***

The standards governing settlements in bankruptcy are well established.  It is axiomatic that settlements are favored, but the unique nature of the bankruptcy process means judges must carefully examine settlements before approving them. *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006).  In order to be approved, a settlement must be "fair and equitable." *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1, 10 (1968).

In fleshing out the general requirement of *TMT Trailer* that settlements be "fair and equitable," the Third Circuit

---

[9] The Plan Administrator took no position in connection with the Motion to Compel.

has provided four criteria for a court to consider when faced with a proposed settlement: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *Nutraquest*, 434 F.3d at 644 (citing *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)). The Third Circuit recently noted that while the *Martin* Court "t[ook its] cue" from *TMT Trailer*, the origin of the *Martin* factors can be traced back to *Drexel v. Loomis*, 35 F.2d 800, 806 (8th Cir. 1929). *See Nutraquest*, 434 F.3d at 645. Moreover, the *Drexel-TMT Trailer-Martin* factors are routinely applied to settlements such as this one involving claims against debtors. *Id.* (collecting cases).

This case involves the settlement of an unsecured claim against the Debtors' estates. The evidence at the hearing established that the Plan Administrator has reserved sufficient funds, absent a settlement, to pay U.S. Bank's claim in full. Thus, the "likely difficulties in collection" factor is not relevant here.

The "probability of success in litigation" factor is the most difficult to apply in this case due to the numerous redactions in the legal invoices underlying U.S.

Bank's claim.    Indeed,  the  Plan  Administrator  testified that,  due  to  the  redactions,  he  did  not  review  the substance  of  the  invoices  in  determining  whether  to  settle U.S.  Bank's  claim.    Rather,  he  focused  primarily  on  the additional cost and delay of litigation.

To  the  extent  the  Plan  Administrator  considered  the legal  invoices,  he  focused  on  the  timing  of  the  legal expenses  incurred.    For  example,  the  Plan  Administrator testified that U.S. Bank incurred approximately 25% of its asserted  legal  expenses  prior  to  the  closing  of  the  Lucent Sale - the  event  that  virtually  assured  the  Notes  would  be paid  in  full.    The  Plan  Administrator  plausibly  testified that U.S. Bank had an extremely high probability of success in  asserting  the  reasonableness  of  its  claim  for  legal expenses prior to the closing of the Lucent Sale.  The Plan Administrator  further  testified  that  U.S.  Bank  had  a  lower probability  of  success  in  asserting  the  reasonableness  of its  claim  for  legal  expenses  after  the  closing  of  the Lucent Sale, especially in light of the fact that U.S. Bank and  two  of  Note  holders  were  members  of  the  Official Committee  of  Unsecured  Creditors,  which  had  primary responsibility  for  negotiating  the  terms  of  the  Plan  on behalf  of  unsecured  creditors.    Thus,  the  Plan Administrator  testified  that,  to  the  extent  he  considered

14

the "probability of success in litigation" factor, he considered it reasonable to pay 100% of the pre-Lucent Sale expenses and approximately 33% of the post-Lucent Sale expenses.

The Court agrees with the Plan Administrator's analysis - as far as it goes.  It is not unreasonable to focus on the additional cost and delay of litigation in this case.  Indeed, the Third Circuit recently noted that "[t]he balancing of the complexity and delay of litigation with the benefits of settlement is related to the likelihood of success in that litigation." *Nutraquest*, 434 F.3d at 646.  Nonetheless, the fact that the two *Martin* factors are related does not eliminate the Court's responsibility to consider the probability of success in litigation.  *Id.* (noting that the District Court did not abuse its discretion in approving settlement where the "probability of success in litigation" factor was satisfied (at least in part) even though "the [District] Court did not devote a full section of its opinion to the factor (as it did for two of the other factors)" where the District Court "said elsewhere that [claimant's] 'decision not to pursue claims against the Settling Defendants may reflect weaknesses in [his] claims and little likelihood of success on the merits.'") (citation omitted).

In this case, considering the probability of success in litigation must involve, in part, a review of the reasonableness of the underlying legal expenses themselves. Unfortunately, the fact that the legal invoices underlying the claim for legal invoices are heavily redacted make it impossible for the Court to make a determination as to the reasonableness of the fees.  For example, U.S. Bank seeks payment of $521,523.60 in legal fees from its lead counsel, Sheppard Mullin.[10]  Of the total of 960.8 hours billed, 429.1 hours (or 44%) had time descriptions that were redacted in whole or in part.  Most of the redactions are so significant that it is impossible to determine the nature of the legal services performed and, thus, their reasonableness.  Moreover, the redacted entries are "top-loaded" with the highest percentage of redacted entries at the highest billing levels.  For example, over 175 hours at billing rates of $600 or more (constituting approximately $120,000) in legal fees had time descriptions that were redacted in whole or in part.  In sum, the Court cannot determine the reasonableness of $218,714.50 in Sheppard Mullin's legal fees due to the redacted time entries.

---

[10] U.S. Bank also seeks payment of $5,813.12 to reimburse Sheppard Mullin for expenses.

Similarly, U.S. Bank seeks payment of $18,668.50 in legal fees from its local counsel, Greenberg Traurig.[11]  Of the total of 65 hours billed, 31.3 (or 46%) had time descriptions that were redacted in whole or in part. Again, most of the redactions are so significant that it is impossible to determine the nature of the legal services performed and, thus, their reasonableness.  In sum, the Court cannot determine the reasonableness of $8,939.00 in Greenberg Traurig's legal fees due to the redacted time entries

Finally, U.S. Bank seeks payment of $63,675.00 for its internal fees.  No description of the basis for these fees is provided and, thus, the Court cannot determine the reasonableness of the entirety of the $63,675.00 sought. Thus, in total, the Court cannot determine the reasonableness of $291,328.50 of the $598,054.00 (or 48.7%) in fees sought by U.S. Bank.  The inability to judge the reasonableness of such a large portion of U.S. Bank's claim makes it impossible for the Court to determine the probability that U.S. Bank would be successful in asserting its claim for legal expenses.

---

[11] U.S. Bank also seeks payment of $4,410.65 to reimburse Greenberg Traurig for expenses.

The *Martin* factors are part of a broader analysis as to whether a settlement is "fair and equitable."  The Court must weigh all the factors and failure to satisfy one or more of the factors does not, *per se*, lead to a conclusion that a settlement should not be approved.  Thus, notwithstanding the deficiency with the "probability of success in litigation" factor in this case, the Court must analyze the remaining *Martin* factors, both of which favor settlement.

The "complexity, expense and delay" factor weighs in favor of settlement.  This is not surprising in that "settlement will almost always reduce the complexity and inconvenience of litigation." *Nutraquest*, 434 F.3d at 646 (citing *TMT Trailer*, 390 U.S. at 434).  In this case, the Plan Administrator testified that the cost of fully litigating U.S. Bank's claim (which, like any fee dispute, would be inherently difficult and time consuming to litigate) could easily exceed $100,000.  Moreover, even though this dispute has been pending since September, 2006, the Plan Administrator testified that the extensive discovery and ensuing litigation could take many more months to complete.  The reduction in expense and elimination of further delay support approving the settlement.

Finally, the "interest of creditors" test weighs in favor of settlement. Reducing the amount of claims against a debtor's estate and shortening the administration of that estate, *i.e.*, increasing and speeding recoveries, generally inure to the benefit of creditors. There are, however, two complicating factors in this case. First, because the unsecured creditors have already received their distribution under the Plan, this settlement is for the benefit of the equity holders and not the creditors. Nonetheless, under the facts of this case, the Court can and should consider the interest of equity holders in applying the fourth *Martin* factor. *In re RNI Wind Down Corporation*, 348 B.R. 286, 298 (Bankr. D. Del. 2006).

Second, while this settlement is in the interest of equity holders, it may be to the detriment of certain of the Debtors' creditors in the event that U.S. Bank is successful in asserting its charging lien and recovers the approximately $300,000 shortfall in fees and expenses under the proposed settlement from the payment U.S. Bank previously received on account of the Allowed Bondholder Claim. In such an instance, the Note holders will receive actual payment of 99.56% (as opposed to 100%) on the Allowed Bondholder Claim. Notwithstanding that possibility, the Court finds the settlement to be in the best interest

of the Debtors' creditors as a whole (and equity holders) because: (i) the reduction in payment of 0.44% is immaterial; and (ii) the disadvantage to the Note holders does not outweigh the benefit to the Debtors' estates as a whole. *See Nutraquest*, 434 F.3d at 647.

In conclusion, the only *Martin* factor weighing against approving the settlement is the "probability of success in litigation" factor. The remaining factors are either neutral or support approving the settlement. The issues raised by the redacted legal invoices, however, are significant. In effect, the Plan Administrator and U.S. Bank have requested that the Court approve a settlement where U.S. Bank would receive payment from the Debtors' estates of approximately 100% of its documented claim. While that may be an appropriate ruling on the merits of the claim after trial, it is not a reasonable settlement. Thus, the deficiencies in connection with the "probability of success in litigation" factor are so great as to make it impossible for the Court to determine that the settlement is fair and equitable.

**Should the Court limit the indenture trustee's legal fees to those recoverable from the Debtors' estates?**

Through the Motion to Compel, the Objecting Note Holders seek entry of an order: (i) compelling U.S. Bank to distribute to the Note holders the entirety of the $68,478,755.56 received from the Plan Administrator on account of the Allowed Bondholder Claim, *i.e.*, compelling U.S. Bank to distribute the approximately $600,000 held back by U.S. Bank to cover its fees and expenses in the event that the Plan Administrator does not pay some or all of U.S. Bank's fees and expenses incurred in connection with the bankruptcy; and (ii) directing U.S. Bank to reimburse the Objecting Note Holders for damages, cost and expenses, including attorneys' fees and expenses, incurred in connection with the Motion to Compel.

U.S. Bank argues that this Court lacks subject matter jurisdiction to determine whether U.S. Bank may properly assert a charging lien under the terms of the Indenture.[12] The Court agrees that, *assuming the Plan did not modify the Indenture*, the Court lacks subject matter jurisdiction to determine the Indenture Trustee's rights under the Indenture.

---

[12] U.S. Bank also makes a number of arguments that the Motion to Compel is procedurally improper. As the Court is denying the Motion to Compel on the merits, it is unnecessary to address those procedural arguments in this opinion.

Congress has vested "limited authority" in bankruptcy courts. *Resorts International Financing, Inc. v. Price Waterhouse & Co., LLP (In re Resorts International, Inc.)*, 372 F.3d 154, 161 (3d Cir. 2004) (quoting *Bd. Of Governors v. MCorp Fin., Inc.*, 502 U.S. 32, 40, 116 L.Ed.2d 358, 112 S.Ct. 459 (1991)). The basic statutory grant of bankruptcy court subject matter jurisdiction is contained in 28 U.S.C. § 1334. *RNI Wind Down Corp.*, 348 B.R. at 292.[13] "Related to" jurisdiction under 28 U.S.C. § 1334(b) is the "broadest of the potential paths to bankruptcy jurisdiction." *Resorts International*, 372 F.2d at 163. A bankruptcy court has "related to" jurisdiction over a matter if "the outcome of [the] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Id.* at 164 (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 n.6 (3d Cir. 1984)). Moreover, the Third Circuit has developed a test more restrictive than that articulated in *Pacor* (which was in a pre-confirmation context) for application post-confirmation. *Resorts International*, 372 F.3d at 164-65. Under *Resorts International*, a bankruptcy court has "related to" jurisdiction over a matter if "there is a

---

[13] 28 U.S.C. § 157, which governs whether the matter before the bankruptcy court is a core proceeding, is not an independent basis of subject matter jurisdiction, rather it "delineates the scope of the bankruptcy court's power to exercise the subject-matter jurisdiction granted to the district court under 28 U.S.C. § 1334." *RNI Wind Down Corp.*, 348 B.R. at 292.

close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *Id.* at 166-67. Thus, in order for the Court to have subject matter jurisdiction over the Indenture Trustee's rights under the Indenture, there must be a "close nexus" between the exercise of those rights and the "bankruptcy plan or proceeding." *Id.*

The dispute as to the assertion of the charging lien by U.S. Bank will not effect the Debtors' estates. The only remaining issue between U.S. Bank, the Note holders and the Debtors' estates is the payment of U.S. Bank's reasonable fees and expenses under section 4.5(e) of the Plan. The resolution of that dispute will effect the amount of any claim U.S. Bank may assert as a charging lien. The opposite, however, is not the case because *nothing in the Plan provides for any further payment by the Plan Administrator on account of the Allowed Bondholder Claim*. Not only is there no "close nexus" between the dispute over U.S. Bank's charging lien and the Debtors' estates, the resolution of that dispute between U.S. Bank and the Objecting Note Holders (or others) will have no effect on the Debtors' estates. Thus, under the application of the *Pacor/Resorts* standard, assuming the Plan did not modify the Indenture, the Court lacks subject

matter jurisdiction to determine the Indenture Trustee's rights under the Indenture.

Nonetheless, this Court does have subject matter jurisdiction to determine whether the Plan modified the terms of the Indenture and, if so, to enforce the Court's order confirming the Plan. *Spiers Graff Spiers v. Menako (In re Spiers Graff Spiers)*, 190 B.R. 1001, 1006-1007 (Bankr. N.D. Ill. 1996); *see also* N*orth American Car Corp. v. Peerless Weighing & Vending Machine Corp.*, 143 F.2d 938, 940 (2d Cir. 1944)("We have, therefore, pointed out the existence of such complementary and auxiliary jurisdiction of the court to protect its original confirmation decree, prevent interferences with the execution of the plan, and otherwise aid in its operation"); *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 216 B.R. 764, 768 (W.D. Pa. 1997) ("courts will exercise jurisdiction over post-confirmation disputes if the matter sufficiently affects creditors' recoveries under a plan of reorganization"); *Walnut Associates v. Saidel*, *et al.* 164 B.R. 487, 492 (E.D. Pa. 1994) (bankruptcy court retains jurisdiction over post-confirmation administration of the estate until the final decree is entered); *In re Almarc Corp.*, 94 B.R. 361, 364 (Bankr. E.D. Pa. 1988) (bankruptcy court retains jurisdiction "to protect its [confirmation] decree, to

prevent interference with the execution of the plan, and to aid otherwise in its operation"); *Northwestern Corp. v. Ammondson* (*In re Northwestern Corp.*), 324 B.R. 529, 534 (Bankr. D. Del. 2005) (claims affecting consummation or implementation of the plan will be considered to be "related to" the bankruptcy case).

Indeed, whether the Plan modified the Indenture is the key issue before the Court. The crux of the Motion to Compel is that section 4.5 of the Plan modified the terms of the Indenture to limit the payment of U.S. Bank's fees and expenses to those paid from the Debtors' estates under section 4.5(e) of the Plan. The Objecting Note Holders argue that any other interpretation of the Plan will result in Note holders receiving payment of less than 100% on the Allowed Bondholder Claim, which is inconsistent with the terms of the Plan and the statements in the Debtors' Disclosure Statement for Joint Plan of Reorganization and Liquidation Under Chapter 11 of the Bankruptcy Code, as Revised (the "Disclosure Statement").

In the event that the Objecting Note Holders are correct and section 4.5 of the Plan served to modify the terms of the Indenture, under the plain terms of the Plan, the Court must grant the Motion to Compel. In the alternative, if the Indenture was not modified or voided by

the Plan then the Motion to Compel must be denied for lack of subject matter jurisdiction.

Thus, the entire outcome on this issue rests on whether section 4.5 of the Plan modified the terms of the Indenture.  The Court, however, lacks authority to modify the terms of a private contract, including an indenture, except as provided by applicable law.

In this case, the Objecting Note Holders do not cite to any authority under the Indenture, the Bankruptcy Code or otherwise in support of modifying the Indenture.  Most significantly, the Objecting Note Holders do not cite to 11 U.S.C. § 1123(a)(5)(F), which provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation, such as . . . cancellation or modification of any indenture or similar instrument."  A reading of the Plan and Confirmation Order demonstrates why the Objecting Note Holders fail to cite this provision. Article VI of the Plan, which is entitled "Implementation of the Plan," does not provide for the cancellation or modification of the Indenture.  Similarly, paragraph 5(e) of the Confirmation Order, which is entitled "Implementation of Plan (11 U.S.C. § 1123(a)(5))," merely states that the "plan provides adequate and proper means

for its implementation" and does not provide for the cancellation or modification of the Indenture. Thus, under the terms of the Plan, the Debtors did not invoke the provision of the Bankruptcy Code providing direct authority for modification of the Indenture.

Moreover, the Objecting Note Holders do not argue that the Indenture was modified under its own terms.[14] Neither do the Objecting Note Holders argue, for example, that the Indenture is unenforceable as a matter of public policy. *See General Motors Acceptance Corp. v. Rose (In re Rose)*, 21 B.R. 272, 278 (Bankr. D.N.J. 1982) (courts have authority to declare void as against public policy contracts, or particular provisions therein). Rather, the Objecting Note Holders simply argue that the Indenture is inconsistent with the Plan and, in such an instance, the Plan governs.

That argument is insufficient for a number of reasons. First, absent evidence that the Indenture was modified under applicable law or its own terms, the Court simply lacks the authority to order a modification of the contract. The evidence as to the purported "intent of the parties" upon which both the Objecting Note Holders and

---

[14] Article 11 of the Indenture governs the entry into supplemental indentures, either with or without the consent of the note holders.

U.S. Bank attempt to rely is simply irrelevant absent some threshold evidence or argument (absent here) as to the power of the parties or the Court to modify the contract in the first instance.

Second, the Court is not troubled that its ruling may render certain provisions of the Plan meaningless or superfluous.  While inclusion of such provisions are to be avoided when possible, plans of reorganization (which are drafted by the parties) often contain provisions that have little or no legal effect.  For example, the "retention of jurisdiction" provisions contained in plans of reorganization often purport (without effect) to expand the bankruptcy court's subject matter jurisdiction beyond the limits of 28 U.S.C. § 1334.  *See, e.g., Resorts International*, 372 F.3d at 161 ("[w]here a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.").

Third, the Court is also not troubled that its ruling may render certain provisions of the Plan inconsistent with the disclosure statement.  The issue in determining whether to approve a disclosure statement is whether the disclosure statement "contain[s] adequate information." 11 U.S.C. § 1125(b).  The terms of a disclosure statement do not and

cannot control the terms of a plan of reorganization nor an order confirming a plan.[15]   Indeed, most disclosure statements, including the one approved by the Court in this case, contain disclaimers to that effect.

Thus, the Court finds that nothing in the Plan modified the terms of the Indenture.  The Court further finds that it lacks subject matter jurisdiction over the dispute between the Objecting Note Holders and U.S. Bank over the terms of the Indenture, including the purported right of U.S. Bank to assert a charging lien under the terms of the Indenture.  Whether such a charging lien may be properly asserted under the terms of the Indenture or may be subject to defenses is a matter over which this Court has no jurisdiction and upon which this Court expresses no opinion. [16]

An order will be issued.

---

[15] At best, the Objecting Note Holders may have asserted (but did not) an argument under principles of estoppel or waiver that U.S. Bank may not now argue that the Indenture allows the assertion of a charging lien against the proceeds of the Notes.

[16] As the Court is denying the Motion to Compel on the merits, it is unnecessary to address the Objecting Note Holders' request for damages, cost and expenses, including attorneys' fees and expenses.